CENTRAL ELECTRIC & GAS COM-
PANY, a corporation, Plaintiff,

v.

CITY OF STROMSBURG, NEBRASKA,
a Municipal corporation, and The Court
of Condemnation, composed of Edmund
Nuss, John M. Dierks and Dayton R.
Mounts, Defendants.

Civ. No. 35 L.

United States District Court
D. Nebraska.

July 21, 1960.

Lloyd J. Marti and Warren K. Dalton, Marti, O'Gara, Dalton & Sheldon, Lincoln, Neb., for plaintiff.

Thomas M. Davies and Robert E. Johnson, Jr., Healey, Davies, Wilson & Barlow, Lincoln, Neb., and J. T. Stanton, Stromsburg, Neb., for defendants.

DELEHANT, District Judge.

The plaintiff instituted this action in this court, and by it sought and seeks to obtain a judgment or decree enjoining "the defendants and each of them from further proceedings for the condemnation of plaintiff's gas distribution system located in the city of Stromsburg, Nebraska, or any property used in connection therewith; and from any further actions or proceedings as or before the Court of Condemnation appointed by the Supreme Court of Nebraska on April 14, 1956 * * *; and from any further actions or proceedings leading to the acquisition by the City of Stromsburg, Nebraska of plaintiff's property located in said city or any part thereof through the exercise of authority purportedly arising out of the election held in said city on the 3rd day of April, 1956;" and for general relief incidental to such principal prayer.

To plaintiff's complaint, defendants made timely answer, admitting many of the complaint's contentions, professing a want of information adequate for a response to certain of its allegations, and denying all others. And the answer also asserted in separate further paragraphs sundry matters which the defendants appear in each instance to advance as a "separate defense." Without any approval of the technique of pleading thus pursued—which has lately been followed in some quarters more commonly than should be the case—the court has con-

sidered the tendered facts thus asserted and the legal positions thereby—although in some instances obscurely—advanced.

During the progress of the action, the court considered and denied a motion in plaintiff's behalf for a summary judgment (filings 31 and 32). But, in furtherance of an extemporaneous, though considered, oral announcement (filings 29 and 30), the court, in then acknowledged doubt concerning the merits of, and its eventual decision in, the case, and in order to preserve the *status quo* pending the litigation, entered an order granting a preliminary injunction holding in abeyance, until the further order of the court, the pursuit of the steps admittedly contemplated by the defendants for the taking by defendant, City of Stromsburg, Nebraska, of the plaintiff's gas distribution system which is here involved (filing 27).

In view of the manner in which the action has been submitted for final determination, an extended analysis of the pleadings at this point would serve no practical purpose, but would rather initiate needless repetition. Nearly all, if not actually all, of the pleadings, because of their very nature, are reflected either in the findings of fact, or in the conclusions of law shortly to be set out. So, the court will depart from its ordinary practice and refrain from the formal and extended restatement of the pleadings.

Through the conspicuous diligence of counsel, and after a pretrial conference, the case was submitted to the court upon the pleadings, certain discovery proceedings which are parts of the files in the action, and several factually informative stipulations between the parties. Exhaustive typewritten briefs of counsel have been submitted to, and appreciatively considered by, the court. The court now sets out the facts which it has found, and now finds, to exist. It may be understood that, so far as these findings reflect actual events and primary facts, they are not seriously in dispute. Concerning the implications to be collected from some of them, there is manifest disagreement.

The plaintiff is, and at all times material has been, a corporation organized under the laws of Delaware, but lawfully doing business in Nebraska. City of Stromsburg, Nebraska, is a City of the Second Class, and as such a municipal corporation, incorporated under the laws of Nebraska. Each of the defendants, Edmund Nuss, John M. Dierks and Dayton R. Mounts is a resident and citizen of Nebraska. Paragraph 1 of complaint, admitted.

Plaintiff owns and operates a gas distribution system within the limits of the defendant City of Stromsburg, Nebraska, the value of which is very largely in excess of $3,000. Paragraph 2 of complaint, admitted. This finding is to be understood in association with, and not at all in disregard of, a later finding touching the location of a part or segment of such system actually situated beyond the limits of the city.

At a general election held in the City of Stromsburg, Nebraska on April 3, 1956, a question was presented to the electors of the City of Stromsburg pursuant to the requirements of Section 19–701 R.S.Neb.1943, relative to the acquisition by defendant, City of Stromsburg, of the gas distribution system owned by plaintiff, and located in such city. Paragraph 3 of complaint, insofar as it is admitted.

The ballot containing the question presented to the electors referred to in the last preceding paragraph was in the following form and language:

"Official Ballot
"City of Stromsburg, Nebraska
"General City Election
"Tuesday, April 3, 1956

"Shall the City of Stromsburg, Nebraska, by the exercise of the power of eminent domain acquire and appropriate for the public use, the gas system of Central Electric & Gas Company located within the City of Stromsburg, Nebraska, including the gas distribution system and gas pipelines, and consisting of pressure regulating stations, gas

mains, service connections, meters, and other equipment, the franchise under which said Company is now operating, its contract for the purchase of natural gas sold and used within the City of Stromsburg, Nebraska, and all parts, tangible and intangible, of said gas system, used and useful in the distribution and sale of natural gas and the rendering of gas service within the City of Stromsburg, Nebraska?

"Yes . . . . . . . . ☐

"No . . . . . . . . ☐ "

Paragraph 4 of complaint, admitted.

At such election 644 electors voted on the question above referred to, of whom 390 electors voted, "Yes," and 254 electors voted, "No," upon such question. (Paragraph 5 of complaint, admitted).

On March 13, 1956, Ordinance No. 164 of the City of Stromsburg, Nebraska providing for the submission of the question hereinbefore identified, to the electors of the City of Stromsburg, was adopted, of which Ordinance a copy is set out in a footnote hereto.[1] Such Ordi-

1. Following is a true copy of Ordinance No. 164 of the City of Stromsburg, Nebraska:

"Ordinance No. 164

"An Ordinance calling for the submission at the general municipal election within the City of Stromsburg, Nebraska, on the 3rd day of April, 1956, to the qualified electors of the City of Stromsburg, Nebraska, the question of whether or not the City of Stromsburg, Nebraska, shall by the exercise of the power of eminent domain acquire and appropriate for the public use, the gas system of Central Electric & Gas Company located within the City of Stromsburg, Nebraska, including the gas distribution system and gas pipelines, and consisting of pressure regulating stations, gas mains, service connections, meters, and other equipment, the franchise under which said company is now operating, its contract for the purchase of natural gas sold by it and used within the City of Stromsburg, Nebraska, and all parts, tangible and intangible, of the gas system, used and useful in the distribution and sale of natural gas and the rendering of gas service within the City of Stromsburg, Nebraska.

"Be It Ordained, by the Mayor and Council of the City of Stromsburg, Nebraska:

"Section 1. That at the general municipal election in the City of Stromsburg, Nebraska, to be held on the 3rd day of April, 1956, there shall be submitted to the qualified electors of the City of Stromsburg, the question of whether or not the City of Stromsburg, Nebraska, shall by the exercise of the power of eminent domain acquire and appropriate for the public use, the gas system of Central Electric & Gas Company located within the City of Stromsburg, Nebraska, including the gas distribution system and gas pipelines, and

consisting of pressure regulating stations, gas mains, service connections, meters, and other equipment, the franchise under which said company is now operating, its contract for the purchase of natural gas sold by it and used within the City of Stromsburg, Nebraska, and all parts, tangible and intangible, of the gas system, used and useful in the distribution and sale of natural gas and the rendering of gas service within the City of Stromsburg, Nebraska, the detailed description of said gas system being as follows:

"Property Description

"The Stromsburg, Nebraska, Gas System being the gas property owned by Central Electric & Gas Company, a Delaware Corporation, (with its principal office in Lincoln, Nebraska) located within the City of Stromsburg, Nebraska, and used in supplying natural gas and rendering gas service to said city and its inhabitants, all described in greater detail as follows:

"I. The Gas Pressure Regulating Station and its contents, located approximately 330 feet north of the north line of Tenth Street and 180 feet east of the east line of Main Street, adjacent to the City of Stromsburg, Nebraska, and situated on real estate owned by the Northern Natural Gas Company.

"II. Low pressure gas mains extending from the Gas Pressure Regulating Station, of sizes and located in streets and alleys of Stromsburg, Nebraska, as follows:

"1. 4″ beginning at the Town Border Station, west to Main Street.

"2. 2″ in Central Street projected, from First Street a distance of 1890 feet, more or less, southward to the Merrill homestead.

"3. 2″ in First Street, from Central Street, to a point approximately 270 feet

284

nance was published as required by law on March 22, 1956, and became effective on that date under the provisions of Section 17–613 R.S.Neb.1943. Such Ordi-

west of the west line of Commercial Street.

"4. 2″ in Second Street from a point approximately 380′ west of the west line of High Street to a point 130′ east of the east line of Wall Street.

"5. 2″ in Third Street from the west line projected of Block 3 Headstrom's addition to the alley west of Main Street.

"6. 2″ in Third Street from Exchange Street to a point approximately 100′ east of the east line of Central Street.

"7. 2″ in Fourth Street from the west line projected of Block 6, Headstrom's addition, to the alley west of Main Street.

"8. 2″ in Fifth Street from a point approximately 70′ west of the west line of the alley west of Main Street to Main Street.

"9. 2″ in Fifth Street from the alley east of Main Street to Wall Street.

"10. 4″ in Fifth Street from Main Street to the alley east of Main Street.

"11. 1¼″ in Fifth Street from a point approximately 70′ west of the west line of the alley west of Main to a point approximately 70′ west of the west line of High Street.

"12. 2″ in Sixth Street from High Street to Wall Street.

"13. 2″ in Seventh Street from Main Street to a point approximately 320′ east of the east line of Wall Street.

"14. 2″ in Eighth Street from Main Street to a point approximately 90′ east of the east line of Wall Street.

"15. 2″ in Ninth Street from a point approximately 960′ west of the west line of Main Street to a point 80′ east of the east line of Ekeley Street projected.

"16. 2″ in Tenth Street from Main Street to a point approximately 250′ east of the east line of Exchange Street.

"17. 2″ in Fourth Street from the alley east of Central Street to a point approximately 230′ east of the east line of Home Street.

"18. 4″ in Fourth Street from Exchange Street to the alley east of Central Street.

"19. 4″ in the alley north of Fourth Street from a point approximately 10′ west of the west line of Commercial Street to Exchange Street.

"20. 4″ in the alley north of Fourth Street from the alley west of Commercial Street to a point approximately 70′ west of the west line of Commercial Street.

"21. 2″ in the alley north of Fourth Street from a point approximately 70′ west of the west line of Commercial Street to a point approximately 10′ west of the west line of Commercial Street.

"22. 2″ in the alley north of Fourth Street from the alley east of Main Street to Main Street.

"23. 2″ in the alley north of Third Street from the alley east of Commercial Street to Exchange Street.

"24. 2″ in the alley north of Second Street from the east line of Main Street to Exchange Street.

"25. 2″ in Third Street from a point approximately 140′ west of the west line of Court Street to Court Street.

"26. 2″ in Fifth Street from Wall Street to Ekeley Street.

"27. 1½″ in Sixth Street from Park Street to a point approximately 180′ east of the east line of Park Street.

"28. 2″ in Sixth Street from a point approximately 180′ east of the east line of Park Street to Home Street.

"29. 2″ in High Street from a point approximately 60′ south of the south line of Sixth Street projected to Sixth Street.

"30. 2″ in the alley west of Main Street from the alley south of Second Street to Fifth Street.

"31. 4″ in Main Street from Fifth Street to a point approximately 340′ north of the north line of Tenth Street projected.

"32. 2″ in Main Street from a point approximately 10′ south of the south line of the alley south of Second Street to Second Street.

"33. 2″ in Main Street from a point approximately 90′ south of the south line of the alley south of Fifth Street to the alley south of Fifth Street.

"34. 2″ in Commercial Street from a point approximately 100′ south of the south line of the alley south of Fifth Street to the alley south of Fifth Street.

"35. 2″ in Commercial Street from Sixth Street to a point approximately 70′ south of the south line of Seventh Street.

"36. 4″ in the alley east of Main Street from the alley south of Fifth Street to Fifth Street.

"37. 2″ in Commercial Street from a point approximately 100′ south of the south line of Eighth Street to Eighth Street.

"38. 2″ in Commercial Street from a point approximately 100′ south of the south line of Ninth Street to Ninth Street.

"39. 2″ in Exchange Street from First Street to Fourth Street.

nance, in its section 4, provided for one notice of election to be published not less than ten nor more than twenty days prior to the date of the election con-

"40. 4" in Exchange Street from Fourth Street to the alley south of Fifth Street.

"41. 2" in Exchange Street from Sixth Street to a point approximately 120' north of the north line of Sixth Street.

"42. 2" in Exchange Street from Eighth Street to a point approximately 190' north of the north line of Eighth Street.

"43. 2" in Exchange Street from Tenth Street to a point approximately 190' north of the north line of Tenth Street.

"44. 2" in the alley east of Commercial Street from the north line of Third Street to the south line of Fourth Street.

"45. 2" in Central Street from a point approximately 250' south of the south line of Second Street to a point approximately 100' north of the north line of Second Street.

"46. 2" in Central Street from a point approximately 140' south of the south line of Fourth Street to Fourth Street.

"47. 2" in Central Street from Sixth Street to a point approximately 50' north of the north line of Sixth Street.

"48. 2" in Wall Street from a point approximately 70' south of the south line of Fifth Street projected to Fifth Street.

"49. 2" in Wall Street from Fifth Street at its intersection with the east line of Wall Street to a point approximately 90' north of the north line of Sixth Street.

"50. 2" in Wall Street from a point approximately 100' south of the south line of Ninth Street to Ninth Street.

"51. 2" in Court Street from a point approximately 70' north of the north line of Second Street to Fourth Street.

"52. 2" in Ekeley Street from a point approximately 20' north of the north line of Second Street to Fourth Street.

"53. 2" in Ekeley Street from Fourth Street to a point approximately 240' south of the south line of Eighth Street.

"54. 2" in Park Street from a point approximately 120' south of the south line of Third Street projected to Fourth Street.

"55. 1½" in Park Street from Fourth Street to a point approximately 240' south of the south line of Fifth Street.

"56. 1¼" in Park Street from a point 20' south of the south line of Sixth Street to Sixth Street.

"57. 2" in Home Street from Fourth Street to a point approximately 40' south of the south line of Seventh Street.

"58. 1½" in Union Pacific R.R. right of way running parallel to the southerly boundary of the Union Pacific right of way at a distance of approximately 10' north of said southerly boundary from Central Street to a point approximately 30' east of the east line of Block 3, Town Company's south addition.

"59. 1¼" in the Street between Block 3 and Block 4, Town Company's south addition from a point approximately 530' north of the south line, projected, of Block 3, Town Company's south addition to a point 650' north of the south line, projected, of Block 3, Town Company's south addition.

"60. 1¼" in Fifth Street from a point 70' west of the west line of High Street to a point 90' east of the east line of west boundary.

"61. 1¼" in Fourth Street from a point 70' west of the west line of Washington Street to the west line of Washington Street.

"62. 1¼" in Washington Street from north line of Fourth Street to a point approximately 250' south of Fifth Street.

"63. 1¼" in Ninth Street from a point 80' east of the east line of Ekeley Street projected to 110' east of the east line of Ekeley Street projected.

"64. 2" in Central Street from a point 80' south of Seventh Street to Seventh Street.

"65. 2" in Commercial Street from a point 200' north of Sixth Street to a point 80' south of Fifth Street.

"66. 1¼" in Fifth Street from east line of Home Street to a point 40' west of the west line of Washington Street.

"67. 1¼" in Main Street from the alley south of Third Street to the north line of Third Street.

"III. All gas services connected with and extending from the mains above described insofar as these are property of the gas company.

"IV. Franchise.

"The franchise granted to Central Electric & Gas Company, a corporation, by Ordinance No. 161 of the City of Stromsburg, Nebraska, passed and adopted September 6, 1955.

"V. Contract.

"Application for service and town border natural gas contract between Northern Natural Gas Company, a Delaware Corporation, and Central Electric & Gas Company, insofar as the same relates to natural gas supplied within the City of Stromsburg, Nebraska, a copy

templated therein. (Paragraph 6 of complaint, admitted.)

of which said application and contract is on file with the Federal Power Commission, Washington, D.C., and which application and contract is incorporated into this Ordinance by reference.

"VI. General.

"All gas mains, meters, services, service pressure regulators, valves, cocks, drips, and appliances, customer service branches, and other parts and apparatus of the gas system, all contracts for the purchase and sale of gas, and all rights of way and easements, used and useful in distributing and selling natural gas and rendering gas service within the City of Stromsburg, Nebraska.

"VII. Map.

"Incorporated into this Ordinance, and made a part thereof by reference, is a map of the distribution system of Central Electric & Gas Company aforesaid, within the City of Stromsburg, Nebraska, prepared for the City of Stromsburg, Nebraska, by Hoskins and Associates, Engineers, Lincoln, Nebraska, dated February, 1956, which said map is now on file in the office of the City Clerk of Stromsburg, Nebraska, and shall remain there permanently and be at all times subject to inspection by the public. Additions made to said gas system between that date and until the date of the passage of this ordinance, if any, shall be considered as part of the natural gas system of Central Electric & Gas Company in the City of Stromsburg, Nebraska.

"Section 2. The form of the question to be submitted at this election shall be as follows:

" 'Shall the City of Stromsburg, Nebraska, by the exercise of the power of eminent domain acquire and appropriate for the public use, the gas system of the Central Electric & Gas Company located within the City of Stromsburg, Nebraska including the gas distribution system and gas pipelines, and consisting of pressure regulating stations, gas mains, service connections, meters, and other equipment, the franchise under which said Company is now operating, its contract for the purchase of natural gas sold and used within the City of Stromsburg, Nebraska, and all parts, tangible and intangible, of said gas system, used and useful in the distribution and sale of natural gas and the rendering of gas service within the City of Stromsburg, Nebraska?'

"The votes shall be by ballot which ballot shall contain the question herein-

Notice of the submission of the foregoing question at such election, in lan-

above set out, and in addition thereto under said question the words, as follows:

" 'Yes ........................... □
" 'No ........................... □'

"Each voter in favor of an appropriation of such property as set out in the question submitted, shall place a cross in the square on the ballot to the right of the word 'Yes,' and each voter against the appropriation of such property shall place a cross in the square on the ballot to the right of the word 'No,' and thereby shall indicate his or her vote upon the question submitted.

"The official ballot shall be printed, prepared and arranged by the City Clerk, according to law; and he shall cause a copy of the official ballot to be printed and published in one regular issue of 'The Headlight' of Stromsburg, Nebraska, and 'The Polk Progress' of Polk, Nebraska, not more than ten nor less than three days prior to the day of election.

"Section 3. The election shall be held at the regular voting places in the City of Stromsburg, Nebraska, to wit: in the first ward at the City Library, located at the northwest corner of the intersection of Fifth Street and Commercial Street; in the second ward at the City Hall, located at the southwest corner of the intersection of Fourth Street and Exchange Street; between the hours of eight o'clock A.M., and eight o'clock P.M. on said 3rd day of April, 1956, and election boards and election officials shall be appointed as provided by law.

"Section 4. The Mayor and the City Clerk shall cause a notice of said election to be given and published in one regular issue of 'The Headlight,' a weekly newspaper published at Stromsburg, Nebraska, and of general circulation therein, which notice shall be published not less than ten days nor more than twenty days before the date of said election, and shall set forth the question submitted and to be voted upon, and the manner in which the voter shall exercise his vote, substantially as set forth in Section 2 of this Ordinance, as well as the date, hours and places of holding said election.

"Section 5. At a meeting of the Council of the City of Stromsburg, on the first Monday following said election, to wit: April 9, 1956, the Mayor and Council shall canvass the returns of said election. If a majority of the electors voting upon said question shall have voted 'Yes' then the question shall be declared

guage set out in a footnote hereto,[2] was published in "The Headlight," a newspaper published at Stromsburg, Nebraska, on March 15, 1956 and on March 22, 1956, and was not otherwise published. Paragraph 7 of complaint, admitted. No other notice of such submission was published by the City of Stromsburg, Nebraska, or at its order or direction.

At the election in the City of Stromsburg, Nebraska, held on April 3, 1956, no special question, aside from that reflected in the official ballot, copy of which is incorporated herein (supra) was presented or submitted to the electors of such city; but such election was the annual general election held within the City of Stromsburg for 1956, at which the officers of such municipality were regularly elected.

After the general municipal election held in the City of Stromsburg, Nebraska on April 3, 1956, the Mayor and Council of such city canvassed the returns of such election and, thereupon, certified to the Supreme Court of Nebraska that the

to have carried, and the Mayor and Council of the City of Stromsburg shall certify the results of said election to the Supreme Court of Nebraska, as provided by law, and shall proceed with the necessary measures to appropriate and acquire the hereinbefore described property of Central Electric & Gas Company for public use. If less than a majority of the electors voting upon said question shall vote 'Yes,' then said question shall be declared lost and this Ordinance shall be repealed.

"Section 6. This Ordinance shall be known as Ordinance No. 164.

"Passed and approved this 13th day of March, 1956.

"Edwin L. Anderson

"Attest: Edwin L. Anderson, Mayor
"Warren E. Johnson
"Warren E. Johnson, City Clerk
"(Seal)"

2. Following is a true copy of the notice of submission as published:

"City of Stromsburg,
Nebraska
"Notice of Submission of
Question at General
Municipal Election

"Notice Is Hereby Given that at the general municipal election duly called and to be held in the City of Stromsburg, in Polk County, Nebraska, on the 3rd day of April, 1956, there will be submitted to the qualified electors of said city the following question:

" 'Shall the City of Stromsburg, Nebraska, by the exercise of the power of eminent domain acquire and appropriate for the public use, the gas system of Central Electric & Gas Company located within the City of Stromsburg, Nebraska, including the gas distribution system and gas pipelines, and consisting of pressure regulating stations, gas mains, service connections, meters, and other equipment, the franchise under which said Company is now operating, its contract for the purchase of natural gas sold and used within the City of Stromsburg, Nebraska, and all parts, tangible and intangible, of said gas system, used and useful in the distribution and sale of natural gas and the rendering of gas service within the City of Stromsburg, Nebraska?'

"The votes shall be by ballot which ballot shall contain the question hereinabove set out, and in addition thereto under said question the words, as follows:

" 'Yes ...................... □
" 'No ...................... □ '

"Each voter in favor of an appropriation of such property as set out in the question submitted, shall place a cross in the square on the ballot to the right of the word 'Yes,' and each voter against the appropriation of such property shall place a cross in the square on the ballot to the right of the word 'No,' and thereby shall indicate his or her vote upon the question submitted.

"The voting places will be as follows: in the first ward at the City Library, located at the northwest corner of the intersection of Fifth Street and Commercial Street, and in the second ward at the City Hall, located at the southwest corner of the intersection of Fourth Street and Exchange Street, in said city and all qualified electors of the city will vote at said place and the polls will be open from 8:00 A.M. until 8:00 P.M. on said date.

"By the Order of the Mayor
and Council of Said City
"Edwin L. Anderson,
"Mayor
"(Seal)    Warren E. Johnson,
"City Clerk"

question presented in and by the official ballot already copied herein had been carried.

Upon receipt of the certificate mentioned in the last preceding paragraph hereof, the Supreme Court of Nebraska appointed Edmund Nuss, John M. Dierks and Dayton R. Mounts, of whom each was and is a District Judge of the State of Nebraska, as members of a Court of Condemnation to fix the value of plaintiff's property located in the City of Stromsburg, Nebraska.

Pursuant to the order of the Supreme Court of Nebraska, the Court of Condemnation, thus constituted, met and organized on May 26, 1956. On May 26, 1956, such Court of Condemnation fixed June 26, 1956 as the date for the filing of the petition of the City of Stromsburg, Nebraska in such condemnation proceedings, and fixed August 4, 1956 as the date for the next meeting of such Court of Condemnation, and fixed, in accordance with the requirements of the laws of Nebraska, both the time for service and the time within which to plead in such condemnation proceeding. The complaint in this action was filed on June 16, 1956, which was prior both to the expiration of the time for service and to the time within which to plead thus fixed by the Court of Condemnation.

Of the property by the plaintiff owned and used as a part of, and physically connected to, its gas distribution system at Stromsburg, Nebraska, the following items and each of them are, and is physically located outside of the city limits of the City of Stromsburg, Nebraska, and were and was so located both on March 13, 1956 and on April 3, 1956:

A. The gas pressure station referred to in the ballot (supra) and in the notice of election, and also in Ordinance No. 164 (of which a copy is attached to the complaint, and is also set out in footnote 1) commonly known as the Town Border Station, located north of the city limits of the City of Stromsburg, with regulating and odorizing equipment, and approximately 185 feet of 4-inch main extending 100 feet west from such Town Border Station, and approximately five feet south therefrom to the main in Main Street projected, of such City of Stromsburg; and,

B. Approximately 860 feet of 2-inch main in Central Street projected, of the City of Stromsburg, extending from the city limits of such city southward to Merrill homestead, and connected to two services, which main is a part of that described in Paragraph II, section 2, of the Property Description contained in Section 1 of Ordinance No. 164, of which a copy is attached to the complaint herein (see footnote 1).

The plaintiff owns, and at all times material herein has owned such Town Border Station. Among the items of property located in and constituting parts of such Town Border Station (without exhaustive resolution into their minute elements) were and are these distinct items:

A metal building six feet by eight feet in size, with its excavation and foundation;

A Fisher King Booster regulator line, with its pipes, valves, fittings, reducer, booster and related equipment;

A vent line, with its pipes, valves, fittings and related equipment;

A balanced valve regulator line, with its regulator, pipes, valves, fittings and related equipment;

A bypass line, with its pipes, valves, fittings, gauges, and related equipment; and

Odorizing equipment, with its natural gas odorizer, piping, valves, fittings and related equipment.

Such Town Border Station, together with its equipment, was at all times material herein, and is, an important, essential and valuable part or segment of plaintiff's gas system serving the City of Stromsburg, Nebraska and its inhabitants. A detailed and complete inventory of the building and equipment of such Town Border Station is set out in a stipulation of the parties as a part of the record upon which the case is submitted to the court, and the court is thereby

made aware of all of the items reflected in that inventory. The Town Border Station connects, and no other instrumentality connects, the gas distribution system of plaintiff serving the City of Stromsburg, Nebraska and its inhabitants to the natural gas pipeline of Northern Natural Gas Company through which plaintiff receives a supply of natural gas wherewith to serve such city and its inhabitants.

Located at, and constituting a part of, such Town Border Station are:

Valves which reduce the gas pressure from transmission pressure to distribution pressure;

Valves which serve to stop the flow of gas into the distribution system;

Valves and piping which are operable to permit gas to bypass the automatic regulating equipment in case of fire or other emergency;

Safety valves operable to release pressure in the distribution system in case of malfunction of the automatic regulating equipment;

Odorizing equipment used to introduce a malodorant into the supply of natural gas passing through the Town Border Station into the distribution system, which, in view of the odorless quality and danger to human life of natural gas, is a relatively imperative safety device; and

Recording and indicating gauges permitting visual observation of the functioning of the regulating equipment.

From the Town Border Station, a 4-inch main extending west for about 180 feet, thence south for about 5 feet, delivers natural gas from Northern Natural Gas Company's pipeline and such Town Border Station into the distribution system serving the City of Stromsburg, Nebraska, and its environs, and its and their inhabitants.

Included in the property owned by plaintiff and connected with its gas distribution system at Stromsburg is, and on April 3, 1956 was, the following property, which is located within the city limits of Stromsburg, Nebraska, to wit: "About 80 feet of two-inch main and 109 feet of one and one-fourth inch main located in Ninth Street projected eastward along the center of Ekeley Avenue in the City of Stromsburg, Nebraska."

Pleadings were filed by defendant, City of Stromsburg, Nebraska, and by plaintiff, with the Court of Condemnation, identified herein. Such Court of Condemnation fixed October 6, 1956 as the date upon which a hearing would commence, at which hearing evidence was to have been taken as to the value of plaintiff's gas distribution system serving the City of Stromsburg, Nebraska and its inhabitants. Said hearing would have been held commencing on the date so fixed therefor, but for the preliminary injunction granted herein (supra). Unless enjoined and restrained therefrom the defendant, City of Stromsburg, Nebraska, and the defendants, Court of Condemnation and Edmund Nuss, John M. Dierks and Dayton R. Mounts, as the members thereof, will proceed to the fixing of a value for plaintiff's gas distribution system so serving the City of Stromsburg, Nebraska and its inhabitants. Upon the making of an award by such Court of Condemnation, the defendant, City of Stromsburg, Nebraska will have the right to take possession of plaintiff's said gas distribution system forthwith upon the tender to the plaintiff by such City of Stromsburg, Nebraska of the amount of such award.

Agreed upon by stipulation in writing between the parties hereto (filing 40), and accepted by the court to be a fact, is the statement that a certain photographic copy of a pleading, annexed to filing 40 herein, is a true copy of the Petition and Specifications filed with the Court of Condemnation in the action, out of which arose the opinion of the Supreme Court of Nebraska reported as Consumers Public Power District v. Eldred, 146 Neb. 926, 22 N.W.2d 188. This factual finding is made not as of a matter immediately and directly relevant to this litigation, but rather as an historical cir-

cumstance possibly reflective upon the significance, if any, which by this court should be attributed to the opinion cited in this paragraph. The court considers that it ought not to copy in detail herein the photographic copy of pleading, but should reserve the right, if it be so advised, in the citation of and comment upon the cited opinion, to advert to the pleading, or to particular language in it.

Also agreed upon by stipulation between the parties hereto (filing 41) and by the court accepted as a fact is the statement that a certain photographic copy of a written instrument annexed to filing 41 herein is a true copy of the Ordinance of the City of Bridgeport, Nebraska, which Ordinance was involved in the litigation leading to the opinion in Consumers Public Power District v. Eldred, supra. Without repetition, the court now announces that it regards that copy of Ordinance in the same manner (*mutatis mutandis*) as it regards the copy of pleading mentioned in the last preceding paragraph. Both items serve somewhat to illuminate, and in a measure to provide, contextual material for the evaluation of, the Eldred case. Neither is directly evidentiary in this litigation.

On August 23, 1956, the defendants addressed to the plaintiff certain interrogatories in this action, which were filed herein on August 24, 1956 (filing 9). Among those interrogatories was one numbered 2 which, on the hypothesis that plaintiff might (as it did) answer the immediately preceding question in such manner as to deny that the description of property in Ordinance No. 164 "correctly describe(d) the gas distribution system owned by Central Electric and Gas Company, and located within the City of Stromsburg, Nebraska," demanded the disclosure by plaintiff of "a correct property description." To such interrogatory 2 (among others), plaintiff made answer which was filed on September 21, 1956 (filing 17), and to interrogatory No. 2 alone a supplemental answer, which was filed on April 11, 1957 (filing 36). Attached to and incorporated into such original answer (filing 17) was an inventory in seventeen typewritten pages, concerning which, in the body of its answer, plaintiff declared that it was

"an inventory of plaintiff's property at or in the vicinity of Stromsburg, Nebraska, and used in serving the City of Stromsburg, Nebraska, which inventory shows the property included in plaintiff's gas distribution system serving the city of Stromsburg. *Some of this property is located outside the city of Stromsburg as generally described in the answer, and supplemental answer to interrogatory No. 4 heretofore served and filed herein.*" (Emphasis added.)

The answer and supplemental answer to interrogatory No. 4 have to do with the Town Border Station, including its pressure regulating and odorizing facilities, and its other equipment (*vide supra*). By its supplemental answer to such interrogatory No. 2 (filing 36), plaintiff amplified its original answer to that interrogatory, and in some four closely typewritten pages, set out assertedly exact descriptions of many items of its property which, it contended, were incorrectly described in Ordinance No. 164. The court considers that the comprehensive incorporation of the descriptions in such answer and supplemental answer into this memorandum would indefensibly expand it. Counsel will understand, however, that their information has had the attention and consideration of the court. Concerning all the items mentioned in such answer and supplemental answer, or either of them, the court finds, in harmony with a stipulation of the parties (filing 39) that the properties owned and operated by plaintiff, and by it described in such answer and supplemental answer, or either of them, are not physically connected with any other property owned or operated by plaintiff.

Through one or some of its officers or employees, the plaintiff was, at, on, and after some undefined and uncertain date before March 6, 1956, made aware of the

pendency of a project for the acquisition under the right of eminent domain by the defendant, City of Stromsburg, Nebraska, of the gas distribution system of the plaintiff, wherewith the plaintiff was then and still is serving the City of Stromsburg, Nebraska and its inhabitants.

In behalf of plaintiff, on March 6, 1956, the following persons, whose positions with plaintiff were as respectively hereinafter set forth, to wit:

| Person | Position with Plaintiff |
| --- | --- |
| L. D. Densmore | Vice President and General Manager, Lincoln, Nebraska |
| H. R. Slocum | District Manager, Columbus, Nebraska District |
| Eldon W. Anderson | Local Manager, Stromsburg, Nebraska System |
| L. J. Marti | Attorney at Law, Lincoln, Nebraska |

appeared before the Mayor and Council of the City of Stromsburg, Nebraska, at their meeting held on that date, and presented arguments against action on the part of the City of Stromsburg, Nebraska to effect such condemnation. Neither before, nor at, or during such meeting did the plaintiff know, or have, or receive information, that the City of Stromsburg, Nebraska, contemplated immediate action to condemn plaintiff's gas system, or the submission of the question of condemnation to the electors of such city at its municipal election on April 3, 1956.

Thereafter, and prior to the general election held on April 3, 1956, in the City of Stromsburg, Nebraska, plaintiff, or its representatives or employees, caused handbills and other literature to be distributed within the City of Stromsburg, Nebraska, on a house to house basis within such city in an attempt to defeat the proposal to condemn the Stromsburg gas system, which was presented to the electors of such city at the election on April 3, 1956. In that effort, plaintiff caused to be printed four hundred copies of a combination of an envelope, letter and handbill, of which it is not shown how many were distributed; one thousand copies of a folder printed on both sides of letter-size paper, of which it distributed about six hundred copies; and

a number of mimeographed sheets, some of which were in answer to separate specific questions, and were distributed, but of which there was no general distribution except in the case of two such items. For the preparation and printing of such material, plaintiff expended $121.61, exclusive of any charges or allocation on account of the time of its executives or counsel. In the course of its efforts, plaintiff caused the transmittal of form letters as follows: on March 23, 1956, a letter to 275 female residents of Stromsburg, Nebraska; on March 27, 1956 about 600 copies of a letter, and on March 31, 1956 about 636 copies of another letter.

Moreover, in the like interval, plaintiff, through persons acting in its behalf, made a house to house canvass of known eligible voters within Stromsburg, Nebraska, to obtain information as to the sentiment of those voters with regard to the then pending question of the condemnation of plaintiff's property within the City of Stromsburg, Nebraska. This it did in furtherance of its desire and purpose to dissuade the voters of such city from the approval of the proposed condemnation.

Also, in furtherance of such desire and purpose, the plaintiff, through persons acting in its behalf, and on April 3, 1956, approached by telephone communication

a number of the eligible voters of the City of Stromsburg, Nebraska, known to be opposed to the condemnation of the plaintiff's property within such city, and requested such persons to appear at the polls and vote at the election set for, and held on, April 3, 1956.

Prior to such general election on April 3, 1956, in the City of Stromsburg, Nebraska, plaintiff, or its representatives or employees, purchased and used newspaper space for advertisements prepared in behalf of it, in an attempt to defeat the proposal to condemn the Stromsburg Gas System.

Plaintiff attempted, in connection with the submission at the general election on April 3, 1956, to the electors of Stromsburg, Nebraska of the proposal to condemn its gas distribution system, to bring the fact that the question of the condemnation of its property was to be voted upon at the election of April 3, 1956 to the attention of every qualified voter of the City of Stromsburg, Nebraska known to the plaintiff, or its employees.

Plaintiff had knowledge of such election (supra), and had the opportunity to carry on a vigorous campaign, and presented the issues to the electors; and took advantage of such opportunity.

Prior to the institution of this suit, plaintiff made no objection as to the notice of the submission of the question of the condemnation of plaintiff's property at the election of April 3, 1956.

On April 1, 1952, in an election then held, in which a proposal to condemn the plaintiff's gas distribution system was determined, the voters of Stromsburg, Nebraska voted against condemnation by a vote of 420 against condemnation, and 238 in favor of condemnation. The ballot submitted to the voters at such election of April 1, 1952 was worded exactly as the ballot submitted on April 3, 1956, supra, with only the following exceptions:

The word "plant" changed in the April 3, 1956 ballot to "system," and,

The insertion of the words, "including the gas distribution system and gas pipelines, and" into the April 3, 1956 ballot immediately after the second reference in the body of the question to "the City of Stromsburg, Nebraska."

Plaintiff has had knowledge of the manner in which the property was described for voting purposes in Stromsburg, Nebraska, since 1952; but made no objection to this description, either prior to or after the April 1, 1952 election (which election was favorable to plaintiff) or prior to the April 3, 1956 election; and the first objection by it was made after the results of the April 3, 1956 election were ascertained and reported; and then its objection was taken by the institution of this proceeding.

Jurisdiction in the present instance presents no problem. It unquestionably exists and rests on Title 28 U.S.C. § 1332 (a) (1).

■ The property involved being located entirely in, and the contemplated taking having been initiated by a municipal corporation of, the State of Nebraska, the administrable substantive law, apart from the impact of the Constitution of the United States, is that of Nebraska. Title 28 U.S.C. § 1652; Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. It may therefore, be understood that in its ruling the court has undertaken to identify that state's law, to the extent that it has been declared, and, in areas not clearly marked out by the accepted authority of the state, to determine the reasonably probable position of the Supreme Court of Nebraska upon any question or questions within that range.

Primarily involved is Section 19–701, R.S.Neb.1943, 1959 Cumulative Supplement. The presently material language of that section follows:

"19–701 Public Utility; Condemnation; Election; Resubmission.

"Whenever the qualified electors of any city of the primary class, city of the first class, city of the

second class, or village shall vote at any general or special election to acquire and appropriate, by an exercise of the power of eminent domain, any waterworks, waterworks system, gas plant or a gas system, including a natural or bottled gas plant, gas distribution system, or gas pipe lines, electric light plant, electric light and power plant, heating plant, street railway, or street railway system, located or operating within or partly within and partly without such city or village, together with real and personal property needed or useful in connection therewith, if the main part of such works, plant, or system be within any such city or village and even though a franchise for the construction and operating of any such works, plant, or system may or may not have expired, then any such city or village shall possess and have the power and authority by an exercise of the power of eminent domain to appropriate and acquire, for the public use of any such city or village, any such works, plant, railway, pipe lines, or system: Provided, that where any public utility properties supplying different kinds of service to such a city or village are operated as one unit and under one management, the right to acquire and appropriate, as provided in sections 19–701 to 19–707, shall cover and extend to the entire property and not to any divided or segregated part thereof, and the duly constituted authorities of any such city or village shall have the power to submit such question or proposition, in the usual manner, to the qualified electors of any such city or village at any general city or village election or at any special city or village election and may submit the proposition in connection with any city or village special

election called for any other purpose, and the votes cast thereon shall be canvassed and the result found and declared as in any other city or village election."

By the next ensuing section of the statute, section 19–702, R.S.Neb.1943, Reissue of 1954, it is provided, among other things, that *"if the election at which the question is submitted is a general election and a majority* [3] *of the votes cast upon such proposition are in favor thereof,* then the city council or village board of trustees, or officer possessing the power and duty to ascertain and declare the result of such election, shall certify such result immediately to the Supreme Court of the State" (emphasis added). The section proceeds to require the Supreme Court within a prescribed time to appoint three of the District Judges from three judicial districts of the state as a Court of Condemnation, and to prescribe the procedure to be followed by such Court of Condemnation in formulating a record in the condemnation proceeding and making appraisal of the property taken. It is not considered that the further language of the section need be quoted here.

By Section 19–704, R.S.Neb.1943, Reissue of 1954, it is provided that:

"19–704 Court of Condemnation; Award; Appeal; Procedure; Effect of Appeal. Upon the determination and filing of a finding of the value of any such plant, works, or system by the said court of condemnation, such city or village shall then have the right and power by ordinance duly passed by its duly constituted authorities, to elect to abandon such condemnation proceedings. If it does not elect within ninety days after the finding and filing of value, then the person or corporation owning any such plant, works or system may appeal from the finding of value and award by the said court

---

**3.** Immediately theretofore the same section makes like provision in respect of the voting on such a proposition at a special election, with this difference that, if the election be a special one, sixty percent of the votes cast upon the proposition is required for an effective affirmative result.

of condemnation to the district court by filing within twenty days from the expiration of the said time given the city or village to exercise its rights of abandonment, with the city clerk of any such city or the village clerk of any such village, a bond, to be approved by him, conditioned for the payment of all costs which may be made on any such appeal, and by filing in said district court, within ninety days after such bond is filed, a transcript of the proceedings before such condemnation court including the evidence taken before it certified by the clerk, reporter, and judges of such court. The appeal in the district court shall be tried and determined upon the pleadings, proceedings, and evidence embraced in such transcript: Provided, that if such appeal is taken the city or village, upon tendering the amount of the value and award made by such condemnation court, to the party owning any such plant, works or system, shall, notwithstanding such appeal, have the right and power to take immediate possession of any such plant, works or system, and the city or village authorities, without vote of the people, shall have the power, if necessary, to issue and sell bonds of the city or village to provide funds to make such tender."

And Section 19–705, R.S.Neb.1943, Reissue of 1954, is in this language:

"19–705 Court of Condemnation; Appeal to Supreme Court; Judgment; Bonds. Upon the hearing of such appeal in the district court, judgment shall be pronounced, as in ordinary cases, for the value of any such works, plant or system, and from such judgment the city, village, party or corporation owning any such plant, works or system, may appeal to any court of last resort. Upon a final judgment being pronounced as to the value of any such plant, works or system, the duly constituted authorities of any such city or village shall have power and it shall be their duty to issue and sell bonds of any such city or village to pay the amount of such value and judgment without vote of the people."

It is in order preliminarily to declare that the court has treated as an item of evidence a copy of an editorial in "The Headlight," a weekly newspaper published in the City of Stromsburg, Nebraska, under date of March 15, 1956 (identified as Exhibit "C" incorporated into the Report of Pretrial Conference, filing 37). However, it is regarded as being of no determinative significance in this decision. It has not been brought home to any party litigant as either its responsible author or its inspiring source, but appears to reflect either the sentiments or the conversational gleanings of an editorial writer. If it has any meaning, it is probably that upon the then pending controversy there was in Stromsburg some difference of opinion.

■ Then, too, the court persists in the attitude by it informally signified on the submission of the action, to the effect that it is not a controlling factor in this litigation whether, as defendants appear to insist, and to state their contention, "if every qualified voter who did not vote at the general election held on April 3, 1956, in the City of Stromsburg, Nebraska, had voted against the proposal presented in the ballot * * * the outcome of the election would not have been changed." No statute is cited, or is believed to exist, which requires the affirmative vote of a majority of all of the qualified electors of the city in support of the proposal voted upon. A majority of the qualified electors actually voting upon the proposition suffices. See quotation from Section 19–702, R.S.Neb.1943, Reissue of 1954, supra, lately herein quoted. There is no point in an exploration of the facts required to sustain the defendants' claim, especially in a municipality whose electors are by law completely unregistered. One who embarked on such an enterprise would probably "stir up more snakes than he could kill."

The defendants have advanced several alleged defenses to the plaintiff's claim, some of which ought to have consideration before the court approaches the merits of plaintiff's claim. With reasonable brevity, such consideration will now be given. Other asserted defenses will be reserved for consideration after the court's signification of its conclusions touching plaintiff's specifications of invalidity in the pending condemnation.

Defendants, as an asserted separate defense, declare that the proposal to be voted on "was brought to the attention of the electors and full opportunity afforded for each elector to attend the election." Standing alone, that is not a defense, or more than an element in a possible defense. It leaves still largely unanswered the question whether the election was validly called and held. That question will be reached shortly.

It is next asserted that the election in controversy was a general election, held pursuant to Section 17–601, R.S.Neb. 1943, which section prescribes the time for the holding of the election, and itself constitutes notice of such election. Factually and legally, that position is correct and is not in dispute. But they allege further that "no other notice of such election is required by the Nebraska Statutes." Here a distinction is in order. The most recently quoted statement is correct in respect of the general election as such. It is not true insofar as a special question was being presented to the electors for determination. To proceed no farther, Ordinance No. 164 itself prescribed the manner of giving notice of such submission. It remains to consider whether the ostensible compliance with that prescription was valid, and also provided adequate notice.

■ At this point, a conceivable barrier to this court's effective jurisdiction may be mentioned, and subjected to disposition. Title 28 U.S.C. § 2283, provides that:

"A court of the United States may not grant an injunction to stay proceedings in a State Court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

No Act of Congress expressly authorizes injunctive relief in the present setting. Nor is such relief necessary in aid of this court's jurisdiction, or to protect or effectuate any judgment by it either already made and given, or in contemplation. But the quoted section of the United States Code is simply inapplicable. The action of the Supreme Court of Nebraska in erecting the Court of Condemnation was not a judicial but rather a ministerial act. The Court of Condemnation itself is not a court; and this is no less true though its members are by law required to be selected from among the judges of the state's court of record of general jurisdiction. It is simply a board of appraisers, whose membership, by statutory mandate, is necessarily recruited from the personnel of the state's judiciary. Moreover, the proceeding pending before it is not—at least not yet—a civil action. Such is the settled view of the Supreme Court of Nebraska. Consumers Public Power District v. City of Sidney, 144 Neb. 6, 12 N.W.2d 104; May v. City of Kearney, 145 Neb. 475, 17 N.W.2d 448; In re Appraisement of Omaha Gas Plant, 102 Neb. 782, 169 N.W. 725; City of Mitchell v. Western Public Service Company, 124 Neb. 248, 246 N.W. 484. And it is accepted and followed by this court and by the Court of Appeals, Eighth Circuit. Village of Walthill v. Iowa Electric Light & Power Company, 8 Cir., 228 F.2d 647.

■ Necessarily encountered is the question whether injunction is an allowable and proper remedy whereby an owner of property may prevent its taking through the void and unlawful exercise of the power of eminent domain. The court is persuaded that such question has to be answered affirmatively. The decisions of the Supreme Court of Nebraska, in settings presently indistinguishable, are to that effect. Consumers Public Power District v. Eldred, 146 Neb. 926, 22 N.W.2d 188; May v. City of

Kearney, 145 Neb. 475, 17 N.W.2d 448; Drummond v. City of Columbus, 136 Neb. 87, 285 N.W. 109, 286 N.W. 779. The court, therefore, approaches its present task in the persuasion that it possesses the jurisdiction and authority to grant the relief which plaintiff is pursuing, if it be found that in consequence of asserted deficiencies in the election of April 3, 1956, the pending condemnation is invalid. Its vital inquiry is upon the validity of the condemnation; and such validity depends upon the legality of that election in respect of the subject.

That Section 19–701, R.S.Neb.1943, supra, erects a procedure for the taking of a plant of this character under the right of eminent domain, and as a step preliminary thereto, for the submission to the electors of the municipal corporation contemplating such a taking of the question whether the proposed taking shall be proceeded with is manifest from the language of the statutory section. It is not considered that any party to this litigation challenges, or even doubts, the proposition that section 19–701 has directly in view such a condemnation, and such an election.

■ The court is also clearly of the opinion that section 19–701 is constitutionally valid. With only modifications which are presently irrelevant, it has been a part of the state's law for more than forty-one years. And it has frequently been carried into execution by the Supreme Court of Nebraska. It is a matter of general knowledge that, in reliance on it, many "public utility properties," (for the title to the enactment, Chapter 188, Laws of 1919, approved April 17, 1919 thus broadly describes its reach) have been acquired by Nebraska municipalities. In those acquisitions, millions of dollars in value have been involved.

■ The constitutionality of section 19–701, supra, has been judicially recognized. May v. City of Kearney, 145 Neb. 475, 17 N.W.2d 448; City of Mitchell v. Western Public Service Company, 124 Neb. 248, 246 N.W. 484. Indeed, the plaintiff here appears to contend not that the cited section of the statute is constitutionally invalid, but rather that the city's attempt to follow it was fatally inept. Even so, the court has given attention to an element of obscurity which unquestionably exists in the cited statute itself. It will have been noticed that it vests in "the duly constituted authorities of any such city or village" the power "to submit such question or proposition, *in the usual manner* to the qualified electors of any such city or village at any general city or village election." (Emphasis added.) The imprecision of the phrase "in the usual manner" is obvious. In his opinion in Iowa Electric Light & Power Co. v. City of Lyons, Nebraska, D.C.Neb., 166 F.Supp. 676, affirmed 8 Cir., 265 F.2d 273. Chief Judge Robinson of this court adverted somewhat obliquely to that imprecision. Of it he said, and the writer hereof thinks correctly: "The choice of the phrase 'in the usual manner' indicates, if anything at all, that the proposition as phrased must not offend our general notions of a fair election."

The court now pauses to observe that the statutory phrase, "in the usual manner," as it appears in section 19–701, supra, is neither unconsidered nor without precedent in Nebraska legislative employment. Chapter 188, Laws of Nebraska for 1919, whereby the section was initially enacted, was introduced by two of the outstanding legislators and lawyers of Nebraska's history, both acknowledged authorities in the field of municipal law, one a Senator, the other a member of the House of Representatives in the state's then bicameral legislature. They did not proceed carelessly or choose their language lightly. Then, too, the exact phrase quoted in this paragraph had been employed in a comparable context by the legislature serving two years earlier in a measure providing for elections looking to the acquisition or appropriation, by a city of the metropolitan class, i. e. Omaha, of property for municipal use. See Chapter 87, § 4A, Laws of Nebraska for 1917. While

it is not contended in this litigation that Nebraska's Supreme Court has yet defined the phrase, "in the usual manner", in its present setting, this court is convinced that, when an occasion requires its construction, that court will consider it, as did Chief Judge Robinson, supra, to require only that the manner of submission shall "not offend our general notion of a fair election," or affirmatively to require conformance to the minimum standards of due process of law.

To conform to the requirements for "a fair election" upon an issue of the sort before the court, the submission of the question of condemnation under the right of eminent domain should be characterized by clarity and certainty of purpose in the language whereby the question is tendered; and the election should be held only after notice which is fair and reasonable in the circumstances. In the present litigation, the plaintiff contends that the City of Stromsburg failed on both of those scores. The court does not agree with that position on either count.

▮ And, first, the court encounters the question of the manner and duration of the giving of notice of the election. Admittedly, section 19–701, supra, defines neither the medium nor the duration of notice. In the single matter of the medium of notice, certainly nothing could be, or is, insisted upon more austere than the publication of notice of the election in a legal newspaper, published and of general circulation in the City of Stromsburg. That was admittedly done in respect of the election in controversy. But the question of the duration of the publication of such notice remains. The cited statute does not declare how many times or for what period such notice shall be published. Plaintiff argues that a notice of such an election ought to be published (presumably in each issue of the newspaper) for four weeks or for thirty days. And its reasoning proceeds somewhat in this fashion. It first recognizes that section 19–701, supra, defines no period at all for notice. Then, resorting to section 19–704, quoted above, it

observes that provision is made in that section that, in the event of a favorable vote upon condemnation within the thought of section 19–701, and in circumstances defined in section 19–704 "the city * * * authorities, without vote of the people, shall have the power, if necessary, to issue and sell bonds of the city * * * to provide funds to make" tender of the amount fixed by the Court of Condemnation as the value of the condemned property, in order to accomplish a taking notwithstanding a pending appeal on the question of value. Similarly, it refers to section 19–705, quoted above, whereunder, upon final judgment on the issue of value of the condemned property, "the duly constituted authorities of any such city * * * shall have power and it shall be their duty to issue and sell bonds of any such city to pay the amount of such value and judgment without vote of the people." It, then, contends that, from the foregoing provisions dealing with the issuance of bonds, it follows that the election of April 3, 1956 must be regarded as having ultimately been an election upon the question of the issuance of municipal bonds for the payment of the eventual purchase price for the plant. And, citing many sections of the statutes of Nebraska, it reminds the court that several of them require notice for thirty days, several others for four weeks, still others for three weeks, and some either for twenty days or for two weeks, preliminary to an election upon the issuance of bonds of municipalities, or other governmental subdivisions. And it appears finally to contend that the interval of notice more commonly prescribed for the publication of notice of elections on bond issues is four weeks, and that this court ought, on that account, to hold that notice of the election in suit should have been published for four weeks. The argument reflects favorably upon the ingenuity and industry of counsel who tender it. But it fails in the test of persuasiveness. If the legislature of the state had intended or desired to define a particular period within which notice of the election must have been published, or the number of such

publications, it could have done so either by direct prescription of a period, or of the number of publications, or by reference to and incorporation of a specific statute already existing in which such a prescription was contained. It elected to do neither. And the court has no commission to impose such a requirement beyond its right to insist upon notice in to satisfy the requirements of a fair such manner and for such duration as election.

In that situation, Ordinance No. 164, now before the court, by its Section 4, declared concerning the notice of the election that:

> "The Mayor and the City Clerk shall cause a notice of said election to be given and published in one regular issue of 'The Headlight' a weekly newspaper published at Stromsburg, Nebraska, and of general circulation therein, which notice shall be published not less than ten days nor more than twenty days before the date of said election."

The court holds that that prescription respecting notice was and is valid. It may be observed that the notice of election involved in Central Power Company v. Nebraska City, 8 Cir., 112 F.2d 471, was, by the Ordinance providing for such election required to be published "at least twenty days before said election." And, from the record in Iowa Electric Light & Power Co. v. City of Lyons, Nebraska, D.C.Neb., 166 F.Supp. 676, affirmed 8 Cir., 265 F.2d 273, it appears that the notice involved in that litigation was published for three weeks. The law requires no precise interval for publication, or number of publications.

■■ But it is also contended by the plaintiff that the foregoing prescription touching notice of Ordinance 164, even if its adequacy be granted, was not validly complied with. That position is not by the court regarded as sound. Notice of the election was actually published in two consecutive weekly issues of "The Headlight," on March 15, 1956 and on March 22, 1956. But Ordinance 164 itself was not published until March 22, 1956. The plaintiff contends, and the court believes correctly, that the publication of the notice of election under date of March 15, 1956 was invalid because no ordinance was yet effective in pursuance of which it was published. But the court does not agree with plaintiff's further argument that the publication of March 22, 1956 was invalid upon the ground that it was inserted in the same issue of the newspaper in which Ordinance 164 was officially published. Let it be granted that the Supreme Court of Nebraska appears not to have passed upon this exact question. However, it is considered that, within the broad reasoning of State ex rel. Thompson v. Winnett, 78 Neb. 379, 110 N.W. 1113, 10 L.R.A.,N.S., 149, that court would sustain the validity of a notice of a municipal election published in the same issue of the paper carrying the official publication of the ordinance providing for the election. In the Winnett case, the court sustained the validity of the election in the state's general election in 1906 of members of the Nebraska State Railway Commission, although the constitutional amendment whereby the Commission was originally provided for was adopted by a vote of the people at the same election at which the members of the Commission were so chosen. Ordinance 164, here under study, became operative in the instant of its publication. There is no invalidity in the notice of the election for which it provided solely because it was published at precisely the same time. By the time it was published, there was authority for its publication in the ordinance, whose formal adoption by the city's council had occurred some nine days theretofore, but whose operative date had to await its publication.

The court, therefore, considers the notice to be valid, insofar as the number of publication or publications, and the time of publication are concerned.

■■ It is also observed that plaintiff's standing as an assailant of the validity of the bonds, with the proceeds whereof the value of its property may eventually be paid, is extremely doubtful. May v. City of Kearney, 145 Neb.

475, 17 N.W.2d 448. It does, however, have good standing to the extent that it directly attacks the legality of the proposed taking of its property. Consumers Public Power District v. Eldred, 146 Neb. 926, 22 N.W.2d 188; State ex rel. Fair v. Frazier, 28 Neb. 438, 44 N.W. 471, irrespective of the source of the funds wherewith payment for it may be made.

It may also be observed finally, in relation to the time and manner of publishing notice, that the election at whose validity this action is directed was not necessarily a "bond election." Even though condemnation was approved at such election and may be proceeded with, it is not certain that a bond issue will result from it. It probably will, but not inevitably. For the defendant city may have other resources from which payment for the plant may be made, if its taking be finally accomplished. Or, upon the coming in of an appraisal, it may, though it probably will not, elect to recede from its proposed acquisition.

But the city's position is also challenged on the ground that the notice of the pending election and the ballot used in it inadequately reflected the proposal under submission.

In the consideration of this issue, the court must have regard to the mission or function of a notice of election, and of a ballot form, oriented to a proposal such as came before the electors of the City of Stromsburg, Nebraska, on April 3, 1956. The notice of election and the ballot form, each in its own way and with due regard to the manner of its individual employment, must be adequate, clearly, intelligibly and unequivocally to apprise the electors of the nature and reach of the proposal upon which they are to be allowed and expected to vote. If the published notice and the ballot form, the latter almost inevitably with the greater economy of verbiage, fairly and frankly disclose the purpose of the sponsors of the proposal, and understandably identify the property at which it is directed, then they are severally adequate, and competently serve their respective functions.

It may not prudently be forgotten that the election is not itself a proceeding in condemnation. It is, indeed, a step in the process towards condemnation, and an important one in that it provides either a public approval of, or a public veto upon, the contemplated taking. But it is only that. Of itself, it condemns no property at all. To the validity of such an election, therefore, it is necessary and sufficient that the notice, broadly and in language which the electors may be expected to understand, indentify the property whose taking is contemplated, and that the ballot form, and the vote upon it, fairly reflect each voter's desire in respect of its taking. Upon an affirmative vote, the condemnation proceeding itself ordinarily follows. One is now being pursued in response to the election of April 3, 1956. In that condemnation proceeding, technicalities in description are more vital. For, in and through it, the property actually to be taken is evaluated in detail, and lawfully and finally taken. Strict and detailed descriptions in it matter vitally.

The test of a fair and valid submission at an election of such a proposition as was determined on April 3, 1956; involves at least two requirements. The first is that the proposed action of the municipality be stated clearly and unequivocally, not obscurely and doubtfully. Thus, in Drummond v. City of Columbus, 136 Neb. 87, 285 N.W. 109, 286 N.W. 779, an election of the character presently in suit was held to be invalid. And a ground of invalidity was the presentation to the electors of the question of approval of the taking in a form which described the items whose taking was under consideration, with the employment of the expression, "and/or." The use in such a setting of that masterpiece of professional dubiety, cowardice and sheer laziness was held to have robbed the submission of the indispensable attribute of precision and certainty about the course of action which the election foreshadowed. And in Consumers Public Power District v. Eldred, 146 Neb. 926, 22 N.W.2d 188, 190, it was emphasized,

in relation to a proposal to condemn public utility property that "the description of property to be taken by eminent domain by a city of the first or second class or village must be accurate to a degree that the property may be identified by reference to the proposal." And the submission there under scrutiny was held to have been inadequate because "the only description is by name of the claimed owner and by indefinite location of property."

On this occasion, there appears to be no uncertainty in the submission on the score of manner of the contemplated taking. It is clearly and consistently declared to involve the acquisition and appropriation for the public use, by the exercise of the power of eminent domain, of the gas system. Nor does the court consider the plaintiff to contend that there is any vagueness or uncertainty about the absoluteness of the taking which is contemplated.

But the plaintiff does challenge the adequacy and accuracy of the description of the property itself whose taking is proposed. And plaintiff seems principally to insist that there is fatal uncertainty and inaccuracy of description in the circumstance that in the ballot by which the electors voted, the question put was upon the acquisition and appropriation of "the gas system of Central Electric & Gas Company located *within the City of Stromsburg, Nebraska,*" (emphasis added) when actually some of that system, including especially the Town Border Station with its pressure regulating and odorizing equipment was and is located outside the official limits of the city.

Now, in Section 1 of Ordinance 164, that most recently quoted description of the gas system appears. But it is followed by two specifying and amplifying features. In the first such feature, the above quoted generality of description is followed by this language:

"including the gas distribution system and gas pipelines, and consisting of pressure regulating stations * * * and all parts, tangible and intangible, of the gas system, used and useful in the distribution and sale of natural gas and the rendering of gas service within the City of Stromsburg, Nebraska."

Secondly, the language thus quoted is itself followed immediately by what is characterized as a description "in greater detail," within which are included the following items:

"I. The Gas Pressure Regulating Station and its contents, located approximately 330 feet north of the north line of Tenth Street and 180 feet east of the east line of Main Street, adjacent to the city of Stromsburg, Nebraska, and situated on real estate owned by the Northern Natural Gas Company.

"II. Low pressure gas mains extending from the Gas Regulating Station, of sizes and located in streets and alleys of Stromsburg, Nebraska, as follows:

"4 Beginning at the Town Border Station, west to Main Street."

This is followed by a long description of some sixty-six further segments of these mains. Again, in paragraph VI of the particularization of the property to be taken is this language:

"All gas mains, meters, services, *service pressure regulators,* valves, cocks, drips, and appliances, customer service branches, and *other parts and apparatus of the gas system,* all contracts for the purchase and sale of gas, *and all rights of way and easements, used and useful in distributing and selling natural gas and rendering gas service to the City of Stromsburg,* Nebraska." (Emphasis added.)

Section 2 of Ordinance 164 prescribes the form of ballot to be employed at the election. That is the form which was actually employed. Supra. And it will be recalled that it made express reference to the fact that the property to be taken included "the gas distribution system and gas pipelines, and *consisting of pressure regulating stations,*" etc. (Emphasis

added.) Moreover, the notice of election published on March 22, 1956 contained a verbatim copy of that ballot with the language therein last quoted. Thus, in the ordinance, in the notice of election, and in the ballot itself, each elector of the city was informed of the intention of the city, if the proposal should prevail, to take by right of eminent domain, the Town Border Station, including the pressure regulating equipment, along with all other elements of the gas system in its entirety. In point of fact, that equipment also included the odorizing equipment.

The validity of notice in this context is to be determined by the answer to the question whether the description in its entirety is adequate to inform the voters what property the city proposed to take. If that question be answered affirmatively, the notice is valid, so far as that point is concerned. And the court is firmly persuaded that an affirmative answer is imperative. Every step in the proceedings leading to the election, including even the naturally brief ballot itself, avowed the intention generally to take the entire gas system of plaintiff, but also specifically to take the pressure regulating equipment and facility, which means the Town Border Station. The ballot, the election notice, Ordinance 164, all disclosed that purpose. There was no concealment, evasion or ambiguity about it. Nor, in the court's opinion, is that conclusion obviated, or even impaired, by the presence in those several instruments of the phrase, "located within the city of Stromsburg, Nebraska." Realistically understood by the voters and inhabitants of Stromsburg, the plaintiff's entire plant was located within the city of Stromsburg. And that is not less true though one or more of its elements—even, the Town Border Station, an important element—be physically placed just outside the technical boundaries of the city. Lawyers and conveyancers are sometimes concerned about, and aware of, a municipality's exact boundaries. The ordinary citizen is rarely, if at all, thus concerned

or aware. He thinks of his city in broader, more general terms. And to him the entire gas system was "within the city of Stromsburg, Nebraska."

The court considers, therefore, that the notice of election was not invalid for misdescription of the property which it was proposed to acquire. It is also concluded that the election was validly called, conducted and held. Consequently, the plaintiff's demand must be rejected in its entirety.

While, in the view to which the court has adhered, it is unnecessary to advert to, and announce the court's opinion upon, certain other defensive material advanced by the defendants, it is regarded as an appropriate further effort.

It is unnecessary, and would be purposeless, to consider the plight of the election as it would have stood, if there had been a failure to comply with the notice requirement of Ordinance 164, whether its requirement be regarded as mandatory or only directory. That requirement was observed; and there is the end of that point.

■ The court rejects the contention of the defendants that plaintiff's exclusive remedy was an election contest under Chapter 32 of the Statutes of Nebraska. That asserted defense to plaintiff's present demand neglects the fact that the plaintiff in this instance is a property owner, which is endeavoring to retain its holdings in the face of what it considers to be its void taking without due process of law. It also overlooks the position of the Supreme Court of Nebraska in many cases, among which are Drummond v. City of Columbus, 136 Neb. 87, 285 N.W. 109, 286 N.W. 779; May v. City of Kearney, 145 Neb. 475, 17 N.W.2d 448; Consumers Public Power District v. Eldred, 146 Neb. 926, 22 N.W.2d 188. Those cases, and others to like effect, arose in circumstances comparable to those before this court.

■ Finally, the court makes brief mention of the position advanced by the defendants that plaintiff, under the facts

clearly existing, is estopped to maintain this proceeding. That estoppel is asserted to have arisen from

a) plaintiff's awareness of the imminence of the election and participation in its preelection controversies without tendering formal objection or exception to the adequacy of notice to the electorate;

b) plaintiff's failure to make objection to the essentially similar manner of submission of the question of condemnation of the same property at an election in 1952, in which the electors rejected condemnation; and,

c) plaintiff's knowledge of the form of ballot used in the election of April 3, 1956 and failure, despite such knowledge, to object or except to such form, until the institution of this suit.

Many definitions of equitable estoppel exist which might be quoted here. One, which in principle is reasonably in point, borrowed from 2 Pomeroy Equity Jurisprudence 894, is thus stated in Roll v. Martin, 164 Neb. 133, 139, 82 N.W.2d 34, 35:

> "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, or contract, or of remedy, *as against another person who in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of property, of contract, or of remedy.*" (Emphasis added.)

Let it be understood that this court is quite aware that question might be advanced of the strict applicability of the quoted definition to the instant controversy. It is not cited as narrowly controlling. However, from the many restatements of the principle of equitable estoppel, the rule emerges that in litigation a party is barred under the principle from asserting an otherwise maintainable position against an adversary who, by the act of the estopped party, or by his inaction in circumstances in which he should have acted, has been induced or otherwise caused to take a position to his disadvantage in reliance on the estopped party's action or inaction, as the case may be.

But the plaintiff is not in this case estopped to assert the invalidity of the election it challenges, under any allowable definition of the principle of equitable estoppel. In the effort to acquire the plaintiff's gas plant, the defendant, City of Stromsburg, Nebraska, has consistently been the aggressor. It is not shown either to have done, or to have refrained from doing, anything at all, or in any wise to have altered its position, by reason either of action or of inaction by the plaintiff. Nor has plaintiff at any time assumed any position at variance with what it now asserts. There is nothing inconsistent with its present challenge to the validity of the election of April 3, 1956 in its activity designed to defeat the condemnation proposal. It had the perfect right to undertake to obtain a vote favorable to its persistence in business, reserving all the while the right to assert, if and when the electors should decide against it, that the election itself was invalidly held. That was equally true respecting the election of 1952 in which plaintiff's position prevailed.

The court decides this proceeding, as counsel may understand, upon the ground that the election of April 3, 1956 was objectively valid, not at all on the ground that the plaintiff is estopped, by any action or inaction on its part, to challenge such election.

Accordingly, judgment and decree is being made and given concurrently herewith, dissolving and terminating the preliminary injunction heretofore entered herein, denying to the plaintiff any relief prayed for in its complaint; dismissing the complaint and this action, and ordering and adjudging that the costs of this action be taxed against the plaintiff.